## Case No. 7,835.

KINZIE v. WINSTON.

[4 N. B. R. (1870) 84 (Quarto, 21).][1]

Circuit Court of Cook County, Illinois.[2]

BANKRUPTCY—TITLE OF ASSIGNEE — FEE SUBJECT TO PUBLIC EASEMENT—ACCRETIONS — EASEMENT ABANDONED — RIGHT OF PURCHASER FROM ASSIGNEE.

The plaintiff, immediately previous to his bankruptcy in March, 1842, had a fee-simple title in Sand street, subject to the public easement, which street then terminated in Lake Michigan, but more than four hundred and fifty feet of accretion now exists between Sand street and the present lake shore. *Held*, that the interest of Kinzie at the time of his decree in bankruptcy,

1 [Reprinted by permission.]
2 [Affirmed in 56 Ill. 56.]

in Sand street, was property within the meaning of the bankrupt act of 1841 [5 Stat. 440], which passed by the decree to the assignee, and by mesne conveyances came from him to the defendant, and that the right of accretion was a vested right inseparably connected with the legal title, and passed with it to the assignee.

[See note at end of case.]

In ejectment.

Scribner & Hurd, for plaintiff.

S. W. Fuller and Mr. Campbell, for defendant.

WILLIAMS, J. This was an action of ejectment, brought for the recovery of the possession of so much of the lands lying east of block 54, in Kinzie's addition to Chicago, as is contained in lots 1, 2, 3, 16, 17, and 18, as numbered on the recorded plat of Ogden & Lombard's sub-division of the accretion east and adjoining lot 12 of Legg's sub-division of block 54 of Kinzie's addition to Chicago. The plaintiff [Robert A. Kinzie] was the purchaser from the United States, and, at a later day, the patentee of the north fraction of section 10, T. 39 N., R. 14 east of the 3d principal meridian, which, on the 22d of February, 1833, he platted as Kinzie's addition to Chicago, and, upon the same day, caused the plat to be duly recorded in the recorder's office of Cook county. The plat was acknowledged and recorded three days before the passage of the act of our legislature, by which the fee-simple title in the streets of plats thereafter acknowledged and recorded became vested in the public. The streets of Kinzie's addition are therefore not governed by the provisions of our statute, but the rights of the public and of private persons are controlled by the common law. Block 54 is the northeast block of Kinzie's addition, and a fractional block; a strip in the front of said block, extending south beyond the centre of said block, being cut off by Lake Michigan. The only portion of said Sand street (the street east of block 54) which appears from the recorded plat to have remained above the waters of Lake Michigan, is a strip extending from the south to the north and terminating in a point somewhere upon lot 12. Sand street is laid out sixty-six feet in width, and the strip of land in Sand street in front of the south part of block 54 is in no place, as it would appear by the plat, thirty-three feet wide. The fact that this strip of land in Sand street bordered upon Lake Michigan, gave to the owners thereof riparian rights, which, in process of time, have become of great value, and hence the present litigation in reference to some of the lots laid out upon the accretion. It would now be difficult to determine precisely when the alluvion commenced to form upon this strip of land in Sand street. The plaintiff claims that it did not commence forming until the years 1844 or '5; the defendant that it began as early as 1840. By

gradual increment the land has extended east of block 54 until it is now alleged that more than four hundred and fifty feet of accretion exists between Sand street and the present lake shore. The lots now in controversy are a part of this alluvion. On the 18th of March, 1842, the plaintiff was declared a bankrupt under the provisions of the act of 1841, and the defendant [Frederick A. Winston] claims through mesne conveyances from the assignee in bankruptcy. The plaintiff insists that the assignee in bankruptcy took no title in Sand street by the decree, and that the title and the subsequent accretions now belong to him (Kinzie).

It is admitted by all parties that the interest of Kinzie immediately previous to the decree in bankruptcy, was a fee-simple title to the strip of land above described as existing in Sand street, subject to the public easement. And the first question in this case is that asked in the brief of the learned counsel for the plaintiff, "Was this naked fee thus subject to a perpetual right of use in the public property, or a right of property in Kinzie, in the sense in which those terms are used in the bankrupt act of 1841? Was it ever contemplated by the framers of that statute, that by its operative power there should pass to the assignee in bankruptcy title to all the streets or public grounds dedicated to public use in our great cities by the bankrupt?" In attempting to answer this question in the light of legal principles and adjudged cases, I shall, for the present, assume the position of plaintiff's counsel to be correct as to the time when the accretions began to form; that is, that they began to form as late as the year 1844, and two years subsequent to Kinzie's discharge in bankruptcy. The 3d section of the bankrupt act of 1841 is as follows: "And be it further enacted, that all the property and rights of property of every name and nature, whether real, personal, or mixed, of every bankrupt, except as is hereinafter provided, who shall, by a decree of the proper court, be declared to be a bankrupt within this act, shall by mere operation of law ipso facto from the time of such decree, be deemed to be divested out of such bankrupt, without any other act of assignment or other conveyance whatever, and the same shall be vested by the force of the same decree in such assignee as shall from time to time be appointed by the proper court for this purpose."

In the language of the plaintiff's counsel "there was nothing there but a small point of land lying next the lake, every point of which had, in 1833, been dedicated to the public use as a street," and that right was one existing (or which might exist) in perpetuity in the public. The right of Kinzie in Sand street in March, 1842, was considered to be of very little value. Kinzie's naked fee in the street, if put up at public

sale by the assignee, would probably have sold for only a nominal price. And the question recurs, was that interest "property" or "right of property," within the meaning of the 3d section of the bankrupt act? "Property (says Bouvier), is the right and interest which a man has in lands and chattels. Burrill defines property to be 'that which is proper or peculiar to one; that which is one's own; that to which one has an unrestricted or exclusive right, including all that is one's own, whether corporal or incorporal.'" Again, the same author defines property to be "the exclusive right of using and disposing of a subject as one's own." This is the strict legal sense of the word, as in the expression "property in land, property in chattels." "Property has been judicially defined the right one has in lands or chattels." 6 Bin. 94; 17 Johns. 283; 1 Comst. [1 N. Y.] 20, 24; 3 Kern. [13 N. Y.] 396. All these definitions ignore the idea of value in the thing owned. If there is an exclusive right to a thing, the law immediately presumes it to have at least a nominal value to the owner. And this right cannot be invaded without subjecting the wrongdoer to at least nominal damages.

It was argued by the plaintiff's counsel, that the object of the bankrupt act was, from sales of the bankrupt's property to obtain money to pay the bankrupt's debts; and that the sale of the naked fee of Kinzie in Sand street, could have brought nothing with which to pay debts. But, if the language of the act is clear and distinct, we must determine from that what was the object of the act. And a fee-simple title to real estate, of however little actual value, would seem to be property by every accepted definition of the word. I have been referred to a number of cases in which the difference between easements in country roads and in city streets is discussed, and it is argued that Kinzie's right was not property, because it was a right in a street of a city, and the burden of public easement had, for all purposes of transfer, extinguished the fee. It is true that the public servitude upon a city street may be, and generally is, far more onerous than upon a country road, and that in the proportion the servitude is increased, the value of the fee is diminished. But the title of the owner of the soil remains unchanged, whatever may be the change in the nature of the servitude. The increase of the burden of the public easements only lessens the value of the owner's interest; it in no way changes its nature. And whether in the city or country, the owner of the fee retains every right not inconsistent with the necessities of the public. If the owner of the land over which a country road is laid retains an interest in all mines, quarries, timber, and earth, he retains it only so far as is compatible with the rights of the public in the highway. If the owner of a street in the city has not the same interests, it is only because the public exigency is greater. If a street in a city is remote from the centers of trade; if it is so situated that it is seldom or never used as a highway, the burden of the urban servitude may possibly be no greater upon it than the burden of the rural servitude may be upon the country road. Sand street, in 1842, terminated in the lake upon block 54, and in no place in front of said block was it of any practical value as a street. While therefore the fee in the street was then of but little value, by reason in part of the public easement, that value could hardly be said to be diminished by the fact that Sand street was within the corporate limits of the city of Chicago. What were the rights of the plaintiff in Sand street upon the 17th of March, 1842? He had the present fee-simple title to the strip of land lying in Sand street, above the waters of the lake, subject to the rights of the public as a highway. He had, in conjunction with the public, a present possessory right in the street, and as against any one other than the public, he could maintain trespass for an invasion of his possessory rights. There are many cases that decide that such rights in the streets of a populous city are of only nominal value, but the position that such rights are not rights of property, cannot be sustained upon authority. Appurtenant to the fee-simple title, the plaintiff had the right to hold such title divested of the easement in case the public should, for any reason, permanently abandon the occupation of the street, and also the right to the accretions, should any attach to this strip of land. He was subject also to the loss of the soil by decrement, in case the water should encroach upon the shore. It is said that this right to the reverter of the street (as it is called), in case of its abandonment by the public, and these riparian rights are "possibilities," and that the act of 1841 does not provide that possibilities shall pass to the assignee.

There is much force in the learned and elaborate argument filed by the plaintiff to show that possibilities are not covered by the bankrupt act of 1841. They were expressly named in the United States act passed in the year 1800 [2 Stat. 19], but are not named in the act of 1841. A possibility, says Burrill (2 Burrill. Law Dict. art. "Possibility"), is "an estate founded on a contingency, which may or may not happen;" and it was an established maxim of the common law "that no possibility, right, title, or any other thing that was not in possession or vested in right, could be granted or assigned to strangers." 3 Washb. Real Prop. 89. Were these rights to the so-called "reversion," and these riparian rights "possibilities" within the legal meaning of that term? In a loose and general sense doubtless they were possibilities, for it was possible and not certain that the public might abandon its easement, and it was possible and not certain that accretions might attach to the existing soil. But a legal "possibility" is an estate founded on a

contingency. First, as to the so-called "reverter," in case the public servitude should cease. Kinzie. on the 17th of March, 1842, had the highest estate known to the law in the soil of the street—a fee-simple title. The public had a possessory right, not necessarily exclusive, but consistent with an imperfect, uncertain possessory interest in the plaintiff. The right of the public was in the nature of an incumbrance upon the title of the plaintiff, and he held that title cum onere. In case the public abandoned its occupancy, the imperfect and uncertain possessory title which the plaintiff then held would have become perfect, and the plaintiff would have held the possessory title solely and absolutely as against all the world, as he then held the fee-simple title. This estate, then, was founded upon no contingency, although the removal of the quasi incumbrance (the abandonment of the easement by the public) was a contingency upon which its value might be increased. It was not, therefore, in the eye of the law, a "possibility." If the fee of an estate was mortgaged to its full value, it would still be property, and the purchaser would take the title with the possibility of being able to compromise the mortgage debt for less than the full amount, or of discharging it by some legal defense; but the estate would not be founded upon a contingency. So a purchaser buys an estate subject to the contingency of its appreciation; but the contingency is not the foundation of the estate, but a mere incident of its existence. This public servitude upon Sand street was in the nature of a mortgage, which might and might not exist in perpetuity, and the possible increment or decrement in the land by the action of the lake, in the nature of a possible appreciation or depreciation in the value of an estate.

Second. As to the accretion. The right to alluvion was a right attached to the land, and he who owned the fee-simple of Sand street owned all that became attached to the shore. "This right," says Washburn, "to alluvion is considered as an interest appurtenant to the principal land, and belonging, in the nature of an incident, to the ownership of that, rather than as something acquired by prescription or possession, in the ordinary legal sense of these terms." 3 Washb. Real Prop. 59. "Alluvion becomes, as fast as it is formed. the property of the owner of the land upon which it forms." Id. 55. "Before a proprietor can set up his claim to accretions and the like, he must show that he owns the shore." Bates v. Illinois Cent. R. Co., 1 Black [66 U. S.] 208. The right of the proprietor of the shore to the alluvion formed thereon is a vested right, resulting from natural law in consequence of the local situation of the land to which it attached. Municipality No. 2 v. Orleans Cotton Press, 18 La. 123. But we are not left without a construction by the courts of the language of the 3d section of the bankrupt act of 1841. Our supreme court has said (2 Gilman, 667): "This

language is sufficiently comprehensive to embrace the most minute and temporary interest in property." And again: "How more comprehensive language to vest the title in the assignee could have been employed, it is impossible to conceive. But lest a doubt might remain, the succeeding clause of the same section has, if possible, made it still more explicit, by providing that the assignee so appointed shall be vested with all the rights. powers, and authorities to sell, manage, and dispose of the same, subject to all the orders and directions of said court, as fully to all intents and purposes as if the same were vested in or might be exercised by such bankrupt before or at the time of his bankruptcy, declared as aforesaid." 25 Ill. 548. See, also [Comegys v. Vasse] 1 Pet. [26 U. S.] 218; Ex parte Foster [Case No. 4,960]; 23 Vt. 744; Carr v. Hilton [Case No. 2,436]. I hold, therefore, that the interest which was held by Kinzie at the time of his decree in bankruptcy in Sand street, was property within the meaning of the bankrupt act of 1841, which passed by the decree to the assignee, and by mesne conveyances came from him to the defendant, and that the right of accretion was a vested right, inseparably connected with the legal title, and passed with it to the assignee. To the same effect is the decision of the United States court in Banks v. Ogden, 2 Wall. [69 U. S.] 69: "Upon Kinzie's bankruptcy, the fee of this strip of land (in Sand street) passed to the assignee. It was about this time, or shortly thereafter, that the alluvion began to form upon it, and continued to increase until the commencement of the suit below. The title to the accretion thus made followed the title to the land and vested in the assignee." Though Kinzie was no party to that suit, and the statement may be regarded as a mere dictum, it still is a declaration of what I regard as the law applicable to this case, sustained upon principle and authority. This view of the case renders it unnecessary that I should discuss the question of fact, as to the time when the accretions began to form. nor whether or how far the statute of limitations affects the rights of the parties to this litigation. The finding of the court is in favor of the defendant.

[NOTE. This is a state case, reported in 4 N. B. R. It was taken on appeal to the supreme court of Illinois by the plaintiff, and there affirmed. Mr. Justice Breese delivered the opinion of the court. He says: "It is not denied that the fee in Sand street was in Kinzie at the time of the decree in bankruptcy. That title and all its incidents passed to the assignee." The conflict in evidence between the plaintiff and defendant as to whether the accretions began at or before 1842 he does not consider material, and says: "But it matters not when these accretions commenced. The fee in the street passing to the assignee became the fee of the purchaser, and. as Sand street, whether dedicated or not. was vacated in 1869, the use and enjoyment of the fee with all its incidents—of which accretion was one—became the absolute and unqualified property of the purchaser. If Kinzie had not

become bankrupt, and assigned his estate in this land, it would have been in him, there is no question. The theory of all bankrupt laws is to place the assignee in the same position the bankrupt occupied, or might occupy, in regard to his estate." 56 Ill. 56.]